[Cite as *State v. Hootman*, 2019-Ohio-607.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| HAROLD HOOTMAN | : | Case No. 18CA31 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Richland County
                                  Court of Common Pleas, Case No.
                                  2017-CR-0701



JUDGMENT:                         Affirmed in Part, Reversed in Part



DATE OF JUDGMENT:                 February 19, 2019



APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

GARY BISHOP                               R. JOSHUA BROWN
Prosecuting Attorney                      32 Lutz Avenue
Richland County, Ohio                     Lexington, Ohio 44904


By: JOSEPH C. SNYDER
Assistant Prosecuting Attorney
38 South Park Street
Mansfield, Ohio 44902

*Baldwin, J.*

{¶1} Defendant-appellant Harold Hootman appeals his conviction and sentence from the Richland County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2} On November 13, 2017, the Richland County Grand Jury indicted appellant on one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree, one count of intimidation in violation of R.C. 2921.03(A), a felony of the third degree, one count of disrupting public service in violation of R.C. 2909.04(A), a felony of the fourth degree, one count of assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree, and one count of theft in violation of R.C. 2913.02(A)(1), a misdemeanor of the first degree.  Appellant entered a plea of not guilty to the charges.

{¶3} A jury trial commenced on March 8, 2018. At the trial, Lucy Thompson testified that starting in June of 2014, she had been in a relationship with appellant for 3 1/2 years after they met at the Wagon Wheel Bar. She testified that, on October 3, 2017, appellant came to pick her up to take her to get a new phone and then he was going to take her to pay her rent.  However, appellant did not take her to pay her rent because he saw too many police around and did not have license.

{¶4} Thompson testified that at some point on October 3, 2017, they went back to appellant's house and after eating, they started drinking beer. She testified that they had a 30 pack that night and that appellant began arguing with her about spending time with her friends the day before. Thompson's ex-boyfriend had been at her friends' house while Thompson was there and appellant was very upset. When Thompson told appellant

that it was time for her to go home, he told her that she was not going anywhere and, at one point, walked up to her and smacked her in the face.

{¶5} Thompson then went upstairs to the bathroom. When she checked her wallet, she discovered that the $220.00 in cash that she had in her wallet to pay her rent and utilities was missing. Thompson then went downstairs and accused appellant of stealing the money because he had stolen from her before and no one else was in the house. Appellant got upset and took Thompson's phone, telling her that she wasn't going to be calling anyone. The two then had words over money and appellant came over and hit Thompson 8 to 10 times with his closed fist in the face. Thompson sustained multiple bruises from the incident. Thompson testified that she wanted to call 911, but that she was unable to do so since appellant had taken her phone and put it in his back pocket. She testified that the phone was a newer one that she had purchased after appellant had thrown her old one and smashed it. Throughout the night, appellant followed Thompson wherever she went in the house and told her that she could not leave. She testified that she told him repeatedly that she wanted to leave but that he would not let her. Thompson testified that she did not try to leave because she was afraid of being attacked again.

{¶6} Thompson testified that after appellant fell asleep, she left and went to the neighbor's house and used his phone to call her son on October 4, 2017. Her son did not answer the phone, so the neighbor, Rob Maurer, took her back to the house. While he was taking her home, Thompson's son called and Thompson told him to meet her at her house. When her son arrived, the two called the police. The Sheriff then arrived and took photographs of her injuries and a statement from her. Paramedics also responded

and treated Thompson who did not go to the hospital because they told her that she was just banged up and bruised and would be okay.

{¶7} Appellant went to Thompson's house in the morning to apologize for what he had done.  Later in the day, Thompson went back to appellant's house to get back her phone and, according to Thompson, appellant was "really apologetic" and was "in tears." Trial Transcript at 154. She testified that appellant went and got ointments and other items to put on her bruises.  Thompson testified that she called the Sheriff's Office a second time because appellant wanted her to take back what she had told them and tell them that she had been attacked while walking home.  She testified that she felt scared that if she did nothing, appellant would hurt her again because he had threatened her life before. Thompson called the Sheriff's Office and told them that it was a misunderstanding and that it did not happen.

{¶8} While Thompson was at appellant's house, police arrived to execute a search warrant. Thompson answered the door and initially told them that appellant was not in the house, but later confirmed his presence. Appellant was found in a closet in the attic. After appellant was apprehended, Thompson made contact with the Deputy who she had spoken to the first night after the incident and told him that she made the second 911 call and told him about the threats. She testified that after appellant was arrested, she had contact with appellant via phone calls and letters and left three or four voice mail messages telling him that she missed him and still loved him. During one of the messages, she apologized to appellant for turning over letters that he wrote to her. One of the letters appellant sent to her was addressed to Jane Hootman. Jane is Thompson's middle name. When asked why the letter was addressed to Jane Hootman, Thompson

testified that it was so they would not know that appellant to sending the letter to her. In another letter, appellant wrote to Thompson, "Baby, I'm so sorry for my dumb-ass attack and I should have dealt with all this months ago." Trial Transcript at 166. Thompson testified that on October 5, 2017, the day the police came out with the search warrant, she  discovered that appellant was still married to his wife.

{¶9}   On cross-examination, Thompson testified that her relationship with appellant lasted 3 1/2 years and that appellant had told her that he was getting a divorce. She testified that some mutual friends and family members had told her that appellant was married and others told her that appellant was not married. She further testified that appellant's wife called her and told her several times that they were no longer married. Thompson admitted that she had a history of calling the police on appellant. She called the police on appellant roughly 15 times within a three year period, but only once were charges brought against him. In one case, charges were brought against both appellant and Thompson. Thompson also was a defendant in such case.  Thompson testified that she told Rob Maurer that she got beat up, but did not tell him that she was abducted or that money was stolen from her.  She further admitted putting money into appellant's account while he was in jail and made statements to appellant that he would never get Barb, his wife back. Thompson also admitted that, in another voice mail, she said that she was sorry for what she did and that she could not let him go back to Barb.

{¶10} On redirect, Thompson testified that appellant told her that he was not married and that she believed him. While she called law enforcement 15 times on appellant, she testified that she never filed  a false police report against him and testified

that he was always "doing something" including slashing her tires, breaking into her apartment, or destroying her car. Trial Transcript at 193.

**{¶11}** At trial, Robert Maurer, appellants' neighbor, testified that he lived across the street from appellant and that, on October 4, 2017, he was asleep on his couch when he heard a knock on his door. He testified that a strange woman was on his front stoop and that she asked to use his phone. The woman, who had a bag and a coat with her, said that she had been in a fight with appellant. Maurer allowed the woman, who he later learned was Thompson, to use his phone. He testified that he offered to give her a ride and that her demeanor was "[d]epressed." Trial Transcript at 200. When asked if he saw any injuries on the woman, he testified that it was dark outside and that he did not have a window in his front door or a light in this vehicle and that he wanted to stay out of it. He told the woman to stand by his truck because he wanted to get her off his porch and stay out of "whatever business was going on." Trial Transcript at 202.

**{¶12}** On cross-examination, Maurer testified that Thompson never suggested that she wanted to go to the police, the sheriff's department or the hospital.

**{¶13}** Deputy Jeffrey Myers of the Richland County Sheriff's Department testified that he had face-to-face contact with Thompson on October 4, 2017 and could see that she had been beaten. He testified that she had bruising, bumps on her forehead, and injury to both of her arms and that he took photographs of her. Her injuries, according to him, were "on the severe side." Trial Transcript at 209. Thompson was visibly upset and when he asked her if she needed a squad, she responded "God, I hope not." Trial Transcript at 210. She did not appear to be intoxicated. After speaking with Thompson, the Deputy initiated an investigation and attempted to make contact with appellant on

October 4, 2017 at his house. No one answered the door, but Deputy Myers testified that he believed that someone was in the house. Because appellant had active warrants for his arrest, a search warrant was obtained to search his house. Deputy Myers testified that dispatch called him over the radio and sent him a message that Thompson had told the dispatcher that she was intoxicated on the night of the incident with appellant and she wanted to make things right.

{¶14} The search warrant was executed on October 5, 2017 at appellant's house. When the officers knocked on the door, Thompson answered and initially told them that appellant was not home, but after being advised about the search warrant, told them that he was upstairs. Appellant was found in the attic crawl space and taken into custody. When he asked Thompson why she had told the dispatcher that she wanted to make things right, she told him that she was afraid of what appellant might do if she pursued charges. Thompson was fearful and tearing up at the time.

{¶15} Deputy Myers testified that appellant told him that Thompson had gotten a ride and was dropped off at the end of his road and was assaulted by someone and someone took her money. When he asked appellant why he did not contact law enforcement, appellant indicated that Thompson had already done so. Appellant also initially denied being at his residence on October 4, 2017 when the Deputy first went to his house, but later admitted that he was there and shut the lights off because he knew that he had active warrants for his arrest. On cross-examination, Deputy Myers testified that the warrants were for failure to appear for probation. He testified that with respect to the allegations of theft, abduction and intimidation, there was no supporting evidence and that there was no supporting evidence that appellant had taken Thompson's cell phone.

On redirect, Deputy Myers testified that he did not think that Thompson was calling in to make it right because of the severity of her injuries and that he believed her when she told him that she did not think that she could leave. He testified that appellant was found in possession of close to $210.00 in cash and that appellant told him that he had been selling items from his house. When asked, he testified that he did not find this plausible because Thompson had told him that appellant had stolen from her in the past.   On re-cross, he admitted that he was unable to ascertain whose money it was.

{¶16}  Appellant testified at trial in his own defense. He testified that he was legally married, but separated from his wife and that he was unemployed.  Appellant testified that he was in a dating relationship with Thompson. Appellant testified on direct examination that he had a criminal record and had been in prison for aggravated burglary and the he had a disorderly conduct and a non-moving  (loss of control) violation. He also had an escape charge after walking away from a minimum security prison camp.

{¶17}  Appellant testified that when he first met Thompson, he told her that he was married and that she had a history of making false accusations against him.  He testified that, on October 3, 2017, they had been drinking when Thompson brought up his ex-wife, Barb. According to appellant, they started arguing about appellant getting back together with Barb and that Thompson started getting "kind of really mean and loud."  Trial Transcript at 250. He testified that they both fell asleep while watching TV and that when he woke up, he found his entry door open and Thompson's bag of belongings gone. Thompson was nowhere to be found. Appellant testified that he attempted to call her and after being unable to reach her, went to bed. Appellant denied that he prevented her from

leaving, assaulted her or took her cell phone or money. He testified that they money that he had on him was for his home equity loan payment.

{¶18} Appellant testified that he next saw Thompson the following day, October 4, 2017. He testified that she called him and asked him to come over to her residence. When asked, he testified that she never made any reference to being assaulted or abducted the night before or to appellant preventing her from having access to the cell phone. Thomson also did not mention that he had stolen any of her money. Appellant testified that while he was in jail, he received phone calls and letters from Thompson and wrote her letters. He testified that in her letters, Thompson indicted that she loved him and missed him and asked him to forgive her.

{¶19} On cross-examination, appellant was questioned about his criminal history. He stated that he had been to prison for aggravated burglary involving the mother of his youngest son and had been convicted of domestic violence involving the mother of another son. Appellant, however, denied hitting the woman. The following dialog took place during cross-examination:

{¶20} Q. Let's look at State's Exhibit 14. Now, you recognize this as your prior conviction our (sic) of the state of Indiana. Correct?

{¶21} A. Well, I, to be honest with you, I don't recall, because I had an attorney. I don't know what I got convicted of, but I recall the incident, when it all transpired.

{¶22} Q. Okay.

{¶23} A. But that says about an entry.

{¶24} Q. Okay. Let's dive in.

{¶25} A. That's from like '95, isn't it?

{¶26} Q. Uhm-hum.  Looking at page 4, State's Exhibit 14, do you see the probable cause affidavit?

{¶27} A. Yeah, okay, that's what it says right here, yeah.

{¶28} Q. Do you recognize it as a probable cause affidavit, Mr. Hootman?

{¶29} A. Yeah, I can read where it says that.

{¶30} Q.  I would like to direct your attention to one, two, four, the fourth paragraph, that on your arrival, your affiant met with Barbara Hootman who advised that sometime late August 15, 1996, or early morning hours August 16, 1996, she and her husband, Harold Eugene Hootman - - that would be you, correct - - became involved in an argument.  Barbara Hootman said that she called 9-1-1, but that Harold Eugene Hootman pulled the cord from the phone.  Do you recall doing that?

{¶31} A. No, I do not.

{¶32} Q. Okay.  Further, she ran out of the house, and Harold Eugene Hootman followed her.

{¶33} THE COURT:  Not so fast.  Slow down a little bit.  It's hard for the court reporter.

{¶34} A. What now?

{¶35} THE COURT:  I was talking to the attorney, not you.

{¶36} MS. BOYER:  Yes, Your Honor.  My apology.

{¶37} Q. That she called 9-1-1, but that Harold Eugene Hootman pulled the cord from the phone; further, that she ran out of the house, ad (sic) Harold Eugene Hootman followed her, catching her outside the home.  Barbara Hootman advised that Harold

Eugene Hootman grabbed her by the throat and hair and forced her back inside the residence.  Do you recall that incident?

**{¶38}** A.  No, not like that, I don't.

**{¶39}** Q.  Do you recall being found guilty of committing a violent offense against Barbara Hootman in Indiana?

**{¶40}** Trial Transcript at 270-272.

**{¶41}** Appellant testified that he pleaded guilty to the incident involving his wife at the time, Barbara.  When asked why he did not call law enforcement even though he had told Deputy Myers while in his patrol car that Thompson had been jumped and assaulted, appellant testified that she told him that she had already contacted them.

**{¶42}** On redirect, appellant testified that his conviction in Indiana occurred in 1995 or 1996 and that he had forgotten about it. He testified that his other conviction was 18 years ago.  He also testified that when he saw Thompson during the early morning hours of October 4, 2017, there was nothing wrong with her.

**{¶43}** At the conclusion of the  evidence and he end of deliberations, the jury, on March 9, 2018, found appellant guilty of abduction, intimidation, disrupting public service and assault, but not guilty of theft. As memorialized in a Sentencing Entry filed on March 13, 2018, appellant was sentenced to a total of five years in prison. Appellant also was ordered to pay $320.00 in restitution to Thompson.

**{¶44}** Appellant now appeals, raising the following assignments of error on appeal:

**{¶45}** "I. THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING APPELLANT TO PAY RESTITUTION IN THE AMOUNT OF THREE HUNDRED AND TWENTY DOLLARS ($320.00) TO LUCY THOMPSON."

**{¶46}** "II. THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO INTRODUCE EVIDENCE OF APPELLANT'S 1995 CONVICTION."

I

**{¶47}** Appellant, in his first assignment of error, argues that the trial court erred in ordering him to pay restitution the amount of $320.00 to Lucy Thompson. We agree.

**{¶48}** R.C. 2929.15(A)(1)(a) authorizes a trial court to impose sanctions on felony offenders, including financial sanctions ordered pursuant to R.C. 2929.18. One financial sanction an offender may be ordered to pay is restitution to a victim "in an amount based on the victim's economic loss." R.C. 2929.18(A)(1). "The amount of restitution ordered by the trial court must be based on the actual loss caused by the offender's criminal conduct, therefore *'[r]estitution can be ordered only for those acts that constitute the crime for which the defendant was convicted and sentenced.'* " (Emphasis sic.) *State v. Peterman,* 12th Dist. Butler App. No. CA2009-06-149, 2010-Ohio-211, ¶ 6, citing *State v. Friend*, 68 Ohio App.3d 241, 243, 587 N.E.2d 975 (10th Dist. 1990), citing *State v. Irvin*, 39 Ohio App.3d 12, 13, 528 N.E.2d 1277 (12th Dist. 1987).

**{¶49}** In the case sub judice, appellant was found not guilty of the theft of $220.00 from Lucy Thompson. As noted by appellee, "[t]here was no testimony of any other out of pocket costs of Ms. Thomas (sic) nor was there any discussion of any restitution made by the State at Appellant's sentencing hearing." Appellee has conceded that the trial court lacked the authority to order appellant to pay restitution.

{¶50} Based on the foregoing, appellant's first assignment of error is sustained and that part of appellant sentence ordering him to pay restitution is vacated.

II

{¶51} Appellant, in his second assignment of error, argues that the trial court erred in admitting testimony regarding appellant's prior 1995 domestic violence conviction. Appellant argues the evidence of such prior conviction was inadmissible under Evid.R. 609(B) because the conviction occurred more than ten years before trial.

{¶52} Evid.R. 609 governs the admission of prior convictions to impeach the credibility of a witness. Subject to the threshold test of relevancy under Evid.R. 403, Evid.R. 609 provides that evidence of prior convictions is "admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 609(B) states that such evidence is inadmissible if a period of more than ten years has elapsed, "unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."

{¶53} We find that any error in this instance constitutes invited error. "'Under the invited-error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make.' " *State v. Stewart*, 8th Dist. Cuyahoga No. 91199, 2009-Ohio-2384, ¶ 25, quoting *State ex rel. Fowler v. Smith*, 68 Ohio St.3d 357, 359, 626 N.E.2d 950 (1994). While on direct examination appellant testified as to his criminal record, he failed to mention his prior conviction for domestic violence. Thus,

appellant opened the door to introduction of the testimony about his prior domestic violence conviction. A court will not find error "when the defense opens the door to otherwise inadmissible evidence." *State v. Davis,* 195 Ohio App.3d 123, 2011-Ohio-2387, 958 N.E.2d 1260, ¶ 26 (8th Dist.). We find that appellant did so here. Once defense counsel questioned defendant about his prior convictions, this opened the door for the prosecutor for similar questioning on cross-examination. It is well-settled that "[a] party will not be permitted to take advantage of an error which he himself invited or induced. * * * * " *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.* 28 Ohio St.3d 20, 502 N.E.2d 590, paragraph 1 of the syllabus.. We find that the trial court did not abuse its discretion in admitting the testimony regarding appellant's prior 1995 domestic violence conviction.

{¶54} Moreover, we note that there was no objection at trial to this testimony so therefore all but plain error is waived. In criminal cases where an objection is not raised at the trial court level, "plain error" is governed by Crim. R. 52(B), which states, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An alleged error "does not constitute a plain error ... unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804(1978), paragraph two of the syllabus.

{¶55} Based on the overwhelming evidence of appellant's guilt as set forth in the statement of facts above, we find no plain error.

{¶56} Appellant's second assignment of error is, therefore, overruled.

{¶57}  Accordingly, the award of restitution is vacated, and the judgment of the trial court is affirmed in all other respects.

By: Baldwin, J.

Delaney, J. concurs

Hoffman, P.J. concurs separately.

*Hoffman, P.J., concurring*

{¶58} I concur in the majority's analysis and disposition of Appellant's first assignment of error.

{¶59} I further concur in the majority's disposition and in its analysis of Appellant's second assignment of error as it relates to its finding the admission of evidence concerning Appellant's 1995 domestic violence conviction did not constitute plain error as well as its finding Appellant "opened the door" for the admission of this evidence by testifying as to his criminal history on direct examination. I write separately only to state I disagree with that portion of the majority's analysis which applies the "invited error" doctrine. I believe there is a difference between the concepts of "invited error" and "opening the door." I find no error occurred in the admission of this evidence, plain or otherwise.